# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8820 | **DATE** | 9/23/2003 |
| **CASE TITLE** | Chicago Messenger Service, Inc., et al. vs. Nextel Communications, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants' Motion for Summary Judgment and Motion to Strike

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendants' Motion for Summary Judgment as to Plaintiffs' Amended Complaint [48-1] is granted, and Nextel West's Motion for Summary Judgment as to its Amended Counterclaim [48-1] is granted in part and denied in part. See attached opinion and order. As a result of these rulings, Defendants' Motion to Strike Plaintiffs' Amended Counter-Statement of Material Facts [72-1] is moot.

*Charles R. Norgle*

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| X | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

SEP 2 4 2003
date docketed

docketing deputy initials

date mailed notice

courtroom deputy's initials

**Document Number**

73

U.S. DISTRICT COURT
CLERK

03 SEP 23 PM 5:06
Date/time received in central Clerk's Office

mailing deputy initials

ED-7

Chicago Messenger Service, Inc. and )
Veterans Messenger Service, Inc., )
                                  )      No. 01 C 8820
                  Plaintiffs, )
                                  )
           v.                     )      Honorable Charles R. Norgle
                                  )
Nextel Communications, Inc. and )
Nextel West Corp. )
                                  )
                Defendants. )

DOCKETED
SEP 2 4 2003

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the court is Defendants Nextel Communications, Inc. and Nextel West Corp.'s

Motion for Summary Judgment as to Plaintiffs Chicago Messenger Service, Inc. and Veterans

Messenger Service, Inc.'s Amended Complaint. Also before the court is Defendant Nextel West's

Motion for Summary Judgment as to its Amended Counterclaim. For the following reasons,

Defendants' Motion for Summary Judgment as to Plaintiffs' Amended Complaint is granted, and

Nextel West's Motion for Summary Judgment as to its Amended Counterclaim is granted in part and

denied in part.

## I. BACKGROUND[1]

Plaintiffs, Chicago Messenger Service, Inc. and Veterans Messenger Service, Inc.

(collectively "Messengers"), bring this diversity suit against Defendants, Nextel Communications,

Inc. and Nextel West Corp. (collectively "Nextel"). Messengers are Illinois corporations in the

---

[1] The court takes the facts from the parties' Local Rule 56.1 statements and
accompanying briefs. Disputed facts are noted in the text.

business of providing messenger delivery services. Messengers employ numerous couriers and maintain communication with its staff of couriers by way of wireless communication equipment. Nextel are Delaware corporations in the business of providing wireless communications equipment and services.[2] Nextel provides a wireless communications system, which Messengers utilized at all times relevant to the present dispute.

In the fall of 1997, Messengers' General Manager, Milt Buzil ("Buzil") was responsible for finding a wireless communications provider. On or about November 10, 1997, Buzil initially entered into negotiations with Robert Picchietti ("Picchietti"), a Nextel employee, which resulted in a written agreement to purchase wireless communications equipment and services from Nextel. Shortly thereafter, Buzil was contacted by an independent dealer of Nextel equipment and services, Scott Lambert ("Lambert") of Radco Communications. Lambert offered Buzil a better price for Nextel equipment. On or about November 12, 1997, Buzil sent a letter to Picchietti rescinding the November 10, 1997 written agreement. Also on or about November 12, 1997, Lambert and Buzil executed written Subscriber Agreements for Nextel equipment and wireless services (more on Lambert to come later). Over the next three years, Messengers entered into numerous similar Subscriber Agreements as it purchased additional wireless equipment to be used on Nextel's wireless system. The Subscriber Agreements were standard form contracts, which Nextel provided to dealers of Nextel equipment and services.

The Subscriber Agreements executed by Messengers expressly noted that by signing, the

---

[2] Nextel Communications has its principal place of business in Virginia, and Nextel West has its principal place of business in Michigan. Jurisdiction is proper under 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interests and costs.

customer signified that he had read, understood, agreed to and accepted the terms and conditions stated on the face and reverse of the Subscriber Agreements. The Subscriber Agreements between Messengers and Nextel included the following pertinent provisions, or provisions substantively similar thereto:

> 6. RATES, CHARGES AND PAYMENT – Company shall issue invoices for Service. Monthly Access charges shall be invoiced in advance. Airtime and long distance charges shall be invoiced in arrears. Customer is responsible to pay Company, on a timely basis, for charges for Service as set forth in the front of this Agreement, and any modifications thereto . . . .
> 13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER – This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or elsewhere, unless expressly agreed to in writing. This Agreement becomes effective when accepted by the Company . . . .

See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Under the parties' agreements, the Monthly Access charge was a fixed monthly fee of $38.25 for all wireless telephones that were assigned to Messengers' accounts. Messengers knew that Monthly Access charges were billed one month in advance, and that in the event Nextel was informed to deactivate a phone during a month, the following month Messengers would receive a prorated credit against the amount it had paid in advance for that phone. Reasons to deactivate a wireless telephone would be if a phone was lost, stolen, damaged, or simply unused and placed in inventory.

Responsibility for managing the wireless telephones was assigned to Messengers' Communications Department. Messengers' Vice President, Paul Pitaro ("Pitaro"), supervised the Communications Department. Other employees of the Communications Department, including

3

Juanita Krmaschek ("Krmaschek") and Jessie Portillo ("Portillo"), issued wireless telephones to Messengers' staff of couriers and maintained related internal documentation. While aware that notifying Nextel that a wireless telephone had to be deactivated would stop that phone from incurring the Monthly Access charge, the Communications Department would not routinely do so. Messengers do not dispute that the contracts between the parties regarding wireless service were written contracts governed by the terms and conditions stated in the Subscriber Agreements; however, Messengers contend that there was also an oral agreement, which was reiterated on several occasions, that Messengers would only be charged Monthly Access charges for wireless telephones that were actually used. Messengers refer to this oral agreement as the "no usage, no access charge" term.

Messengers received detailed monthly bills from Nextel for every month that the parties' three-year relationship existed. Messengers' bookkeeper, Haydee Romo, generally reviewed the Nextel bills every month, and then presented the bills to Messengers' owner and President, William Factor ("Factor"), for payment.

The controversy giving rise to the present case began in March 2001, when Lambert contacted Messengers in regard to Messengers' Nextel bills. Lambert, this time in a capacity as auditor, offered to review Messengers' Nextel bills. After Lambert's audit, Messengers believed that Nextel was improperly charging Monthly Access charges for some wireless telephones that Messengers were not using, contrary to the "no usage, no access charge" term that Messengers allege was orally communicated on numerous occasions. Based on Lambert's audit, Messengers stopped paying Nextel's bills.

Messengers contacted Nextel and requested that its accounts be credited for unused wireless

4

telephones that were assessed the Monthly Access charge. The parties engaged in numerous attempts to rectify the billing dispute. During the course of the dispute, Messengers allege that Nextel employees, Michael Beltrano ("Beltrano") and Randall Burns ("Burns"), told Messengers not to pay the bills until the issue was resolved.

Ultimately, in October 2001, Nextel demanded that Messengers pay the full amounts reflected as owed in Nextel's bill, or Messengers' wireless service would be discontinued. On November 6, 2001, Messengers delivered a check to Nextel in the amount of $123,287.50, representing the amounts that Messengers did not dispute. On November 13, 2001, Factor contacted Burns and requested another meeting to resolve the billing dispute; however, Burns refused and stated that wireless service would be discontinued if the full amounts reflected as owed were not paid by November 16, 2001. On November 15, 2001, Messengers paid an additional $33,000 to Nextel, in exchange for Nextel's agreement to continue Messengers' wireless service through November 27, 2001.

On November 15, 2001, Messengers also filed a complaint in Illinois state court seeking an injunction to prevent Nextel from terminating wireless service to Messengers, and Nextel removed the case to this court that very day. After removal of the case, the parties continued their efforts to resolve the dispute; however, those efforts proved unsuccessful and Nextel terminated Messengers' wireless service on November 28, 2001. As a result of the termination of Messengers' wireless service, Nextel filed a motion to dismiss the complaint as moot and also filed a counterclaim seeking payment of the balance alleged to be due, plus late fees and attorney fees and costs. The parties then entered an agreed order granting Messengers time to file an amended complaint. Messengers proceeded to file a three count amended complaint alleging breach of contract, common law fraud,

5

and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. The gist of all three counts is that Nextel made an oral promise not to charge Messengers the Monthly Access charges for wireless telephones that were not actually used, and that Nextel has not fulfilled that promise.

Nextel has filed a motion for summary judgment, which is fully briefed and ready for ruling.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Seventh Circuit has indicated that cases involving contract interpretation are "particularly well-suited to disposition on summary judgment." Neuma, Inc. v. AMP, Inc., 259 F.3d 539, 542 (7th Cir. 2000).

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden to prove that no genuine issue of material fact exists. See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Once the moving party shows that there is no genuine issue of material fact, the burden shifts to the non-moving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

The non-moving party cannot rest on the pleadings alone, but must identify specific facts that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Fed. R. Civ. P. 56(e). "Conclusory allegations alone cannot defeat a motion for summary judgment." See Thomas v. Christ Hosp. and Medical Center, 328 F.3d 890, 893-94 (7th Cir. 2003) (citing Lujan v. Nat'l

6

<u>Wildlife Federation</u>, 497 U.S. 871, 888-89 (1990)).

Local Rule 56.1 requires both the moving and non-moving parties to submit a statement of material facts, including "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(a)(3); Local Rule 56.1(b)(3)(B). Evidence submitted at summary judgment must ultimately be admissible at trial under the Federal Rules of Evidence. See <u>Woods v. City of Chicago</u>, 234 F.3d 979, 988 (7th Cir.2000). Specifically, hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial. See <u>Eisenstadt v. Centel Corp.</u>, 113 F.3d 738, 742 (7th Cir. 1997). Thus, all facts not properly supported by the record evidence must be disregarded. <u>Brasic v. Heinemunn's, Inc.</u>, 121 F.3d 281, 284 (7th Cir.1997).[3]

The court views the record evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See Fed. R. Civ. P. 56(c). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make a "choice of inferences." See <u>Wolf v. Buss (America) Inc.</u>, 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

### III. DISCUSSION

In cases where a federal district court's jurisdiction is based upon diversity jurisdiction, the court must use the substantive law of the state in which it sits. See <u>Klaxon v. Stentor Electric Mfg.</u>

---

[3] Along with Nextel's Amended Reply Memorandum in Support of its Motion for Summary Judgment, Nextel also filed a Motion to Strike Messengers' Amended Local Rule 56.1 Counter-Statement of Material Facts. In light of this court's standard of decision to be applied in a motion for summary judgment, Nextel's Motion to Strike is disregarded as moot.

Co., 313 U.S. 487, 497 (1941) (indicating "the proper function of the . . . federal court is to ascertain what the state law is, not what it ought to be"); see also Land v. Yamaha Motor Corp., 272 F.3d 514, 516 (7th Cir. 2001). "Rules of contract interpretation are treated as substantive." Dawn Equipment Co. v. Micro-Trak Systems, Inc., 186 F.3d 981, 986 (7th Cir. 1999) (citing Bourke v. Dun & Bradstreet, 159 F.3d 1032, 1036 (7th Cir. 1998)). "As a court sitting in diversity, we attempt to predict how the [Illinois] Supreme Court would decide the issues presented here." Id. (citing Allen v. Transamerica Ins. Co., 128 F.3d 462, 466 (7th Cir.1997)).

## A.      Breach of Contract

### 1.      *Effect of Integration Clause on Admissibility of Parol Evidence*

Count III of Messengers' Amended Complaint alleges breach of contract. The parties present the court with an issue involving the parol evidence rule. Illinois courts have embraced the parol evidence rule in its more conservative approach, which has been termed the "four corners" rule. See e.g., Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 884 (Ill. 1999) (rejecting application of the "extrinsic ambiguity" doctrine, and reiterating "four corners" rule as the proper method for contract interpretation). Under Illinois Supreme Court case law, the "four corners" rule provides: "'An agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" Id. (citing Western Illinois Oil Co. v. Thompson, 186 N.E.2d 285, 291 (Ill. 1962)). In applying the "four corners" rule, Illinois courts look to the language of the contract alone in order to determine whether an ambiguity exists. See id. If an ambiguity exists, parol evidence may be introduced. See id. (discussing the determination of whether an ambiguity exists in a written contract so as to require admission of parol

evidence).

The importance of an integration clause in the parties' written contract takes on great significance under this "four corners" rule. As stated by the Illinois Supreme Court, "where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." Id. at 885. Thus, under Illinois law, the presence of an integration clause is evidence that the parties have executed a fully integrated contract, to be interpreted solely within the four corners of that contract, and which cannot be altered by extrinsic evidence.

In this case, it is undisputed that the parties' written agreements all contained integration clauses, which provided:

> 13. COMPLETE AGREEMENT / SEVERABILITY / WAIVER – This Agreement sets forth all of the agreements between the parties concerning the Service and Purchase of the Equipment, and there are no oral or written agreements between them other than as set forth in this Agreement. No amendment or addition to this Agreement shall be binding upon Company unless it is in writing and signed by both parties. Company shall not be bound by the terms and conditions in Customer's purchase order or elsewhere, unless expressly agreed to in writing . . . .

See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

The presence of such an integration clause "is a clear indication that the parties desire the contract be interpreted solely according to the language used in the final agreement." Air Safety, 706 N.E.2d at 886. Prior to the final execution of each written Subscriber Agreement, Messengers were free to contract as they saw fit. The Subscriber Agreements themselves contemplate that the parties may add or delete terms and conditions to the parties' written agreement before execution. In fact, Messengers took advantage of this opportunity in some of the contracts that the parties executed. By way of example, on the front of one such Subscriber Agreement the following additional contract

9

terms appear:

> Payment Terms. Net 30 days after completion of installation of equipment
> 1% discount if paid within 10 days of completion of installations
> To be installed first week of December (by December 5[th])

See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H. By this handwritten amendment, the parties added a payment term and a delivery term. Thus, Messengers could have easily added the alleged "no usage, no access charge" term to the front of each and every Subscriber Agreement that they executed. However, Messengers failed to do so. The parol evidence rule precludes Messengers from now arguing that the alleged "no usage, no access charge" term, which appears nowhere in the Subscriber Agreements, is a term of the parties' written agreements.

This court recently wrote on the mischief that such claims bring to the stability and certainty of written contracts. See Davis v. G N Mortgage Corp., 244 F. Supp.2d 950, 960-61 (N.D. Ill. 2003) ("Claims seeking to add to, modify, or contradict a written agreement . . . work mischief with the law of contracts and the attendant stability that the law of contracts brings to a myriad of transactions."). The following quote from the Seventh Circuit is also instructive on this issue:

> Memory plays tricks. Acting in the best of faith, people may "remember" things that never occurred but now serve their interests. Or they may remember events with a change of emphasis or nuance that makes a substantial difference to meaning. . . . A statement such as "[no usage, no airtime charges]" may be recalled years later as "[no usage, no access charges]." Prudent people protect themselves against the limitations of memory (and the temptation to shade the truth) by limiting their dealings to those memorialized in writing, and promoting the primacy of the written word . . . .

Rissman v. Rissman, 213 F.3d 381, 384 (7th Cir. 2000).

## 2. *Existence of Ambiguity in Contract Language*

Messengers offer an additional argument in support of its breach of contract claim.

Messengers contend that the language of the Subscriber Agreements is ambiguous, as the Subscriber Agreements do not address the issue of whether the Monthly Access charge will be applied to unused wireless telephones. In response, Nextel contends that the language of the Subscriber Agreements is unambiguous, as the Subscriber Agreements require payment of a fixed Monthly Access charge for each wireless telephone, and that such obligation is not conditioned in any way.

In Illinois, a court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent." Quake Construction, Inc. v. American Airlines, Inc., 565 N.E.2d 990, 994 (Ill. 1990). Again this is done under the traditional "four corners" rule. See Air Safety, 706 N.E.2d at 884. An ambiguity is present only if "the language of the contract is susceptible to more than one meaning." Id. "If no ambiguity exists in the writing, the parties' intent must be derived . . . as a matter of law, solely from the writing itself." Id. As aptly stated by the Illinois Supreme Court: "The court must take the contract as made by the parties. It cannot make a new contract for them or add anything to its provisions." Ortman v. Kane, 60 N.E.2d 93, 98 (1945).

On the front of each Subscriber Agreement, the parties indicated how many wireless telephones would be purchased and subscribed to Nextel's system, and the Monthly Access charge for each wireless telephone. It is undisputed that this Monthly Access charge was $38.25 per each wireless telephone. The back of each Subscriber Agreement provided how the Monthly Access charge would be billed, stating: "Monthly Access charges shall be invoiced in advance." See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I. Within the Subscriber Agreements, this statement is not conditioned in any manner. Thus, there is no ambiguity, and the parties' written agreements provide that every wireless telephone that Messengers subscribed to

11

Nextel's system was to be billed the Monthly Access charge. What Messengers claim to be ambiguous contract language is simply its own belief imposed onto the unambiguous text of the parties' written Subscriber Agreements. Compare Air Line Pilots Ass'n., Intern. v. Midwest Exp. Airlines, Inc., 279 F.3d 553, 556 (7th Cir. 2002) (stating: "the party challenging the literal meaning must present *objective* evidence, not just his say-so, that the contract does not mean what it says") (emphasis in original). Messengers must present more than its interpretation of the language of the contract; it must demonstrate that the language is truly ambiguous – meaning susceptible to more than one meaning – which it has not done. "Any particular interpretation that only the plaintiff may have envisioned at the time a contract is executed is immaterial." Eichengreen v. Rollins, Inc., 757 N.E.2d 952, 958 (Ill. App. Ct. 2001).

Applying the traditional contract interpretation principles of the "four corners" rule, as provided by the Illinois Supreme Court, Messengers may not introduce parol evidence of the alleged "no usage, no access charge" term. The parties' agreement is to be found solely within the Subscriber Agreements. Therefore, since Messengers cannot establish its breach of contract claim against Nextel, Nextel is entitled to judgment as a matter of law. See Celotex, 477 U.S. at 322.

## B. Common Law Fraud and Illinois Consumer Fraud and Deceptive Practice Act

Counts I and II of Messengers' Amended Complaint allege common law fraud and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, respectively. Both claims allege that Nextel charged Messengers the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term. In short, both of these fraud claims are simply a repackaged version of Messengers' breach of contract claim.

### 1. Promissory Fraud

12

Under Illinois law, the elements of the tort of fraudulent misrepresentation are: "(1) [a] false statement of material fact; (2) known or believed to be false by the party making it; (3) made to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." Charles Hester Enterprises, Inc. v. Illinois Founders Ins. Co., 499 N.E.2d 1319, 1323 (Ill. 1986). "In addition, the reliance upon the misrepresentation must have been justified, i.e., the other party had a right to rely upon the statement." Id.

Unlike most states, Illinois generally does not provide a remedy for fraudulent promises. See Michael J. Polelle, An Illinois Choice: Fossil Law or an Action for Promissory Fraud?, 32 DePaul L. Rev. 565, 569-70 (1983). The basis for this general prohibition is that the misrepresentation must be based on present or preexisting facts, and thus, statements of future intent generally cannot be the basis for a claim of promissory fraud. See HPI Healthcare Services, Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 682 (Ill. 1989). This general prohibition is tempered by one exception, "where the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." Steinberg v. Chicago Medical School, 371 N.E.2d 634, 641 (Ill. 1977); see also Roda v. Berko, 81 N.E.2d 912, 915 (Ill. 1948) (recognizing the general prohibition against claims for promissory fraud, but stating that "where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud and thereby cheat and defraud another of his property, equity will right the wrong by restoring the parties to the positions they occupied before the fraud was committed"). Commentators have noted that this "scheme to defraud" exception has not been elucidated, and has resulted in confusion and inconsistent application among Illinois courts. See Roger L. Price and Mark L. Johnson,

Understanding the "Scheme To Defraud" Exception to Promissory Fraud in Illinois, 90 Ill. B.J. 536, 536 (2002) ("The [scheme to defraud] exception has generated a confusing body of case law . . . ."); see also Desnick v. American Broadcasting Cos., Inc., 44 F.3d 1345, 1354 (7th Cir. 1995) ("The distinction between a mere promissory fraud and a scheme of promissory fraud is elusive, and has caused, to say the least, considerable uncertainty, as even the Illinois cases acknowledge.").

Messengers' claim can be disposed of without this court having to enter the bramble bush that is the "scheme to defraud" exception. Messengers allege that Nextel charged the Monthly Access fees for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud.

Messengers provide no admissible evidence for the alleged "no use, no access charge" term. Messengers simply state: "It was [Messengers'] understanding, based on the representations made by Nextel during negotiations, and throughout the relationship, that Nextel would not charge [Messengers] for wireless telephones which were unusable, replaced, unused or otherwise not in service." See Pls.' Amended Local Rule 56.1 Counter-Statement of Additional Uncontested Facts, ¶ 96. The record citations to support ¶ 96 are devoid of any evidence to support this statement. Messengers fail to indicate when "throughout the relationship" these statements were made. The statements that Messengers proffer as having been made by Nextel where made by Lambert, the independent dealer of Nextel equipment and services. However, the record contains no affidavit or deposition testimony from Lambert. Further, Messengers offer no evidence that Lambert was an agent of Nextel, or that Nextel had any knowledge of Lambert's statements, so as to bring Lambert's statements within Federal Rule of Evidence 801. With such deficiencies, the alleged statements are nothing more than hearsay, which is inadmissible and an improper method of defending a motion

14

for summary judgment. See Eisenstadt, 113 F.3d at 742. In short, Messengers simply concludes that the statements were made by Nextel; however, such conclusory allegations are insufficient to create a genuine issue of material fact. See Thomas, 328 F.3d at 894 (reiterating that "Rule 56(e) of the Federal Rules of Civil Procedure specifically prohibits a party from relying upon his allegations to contest entry of summary judgment").

Additionally, Messengers must establish that its reliance on the statements was justified. Charles Hester Enterprises, 499 N.E.2d at 1323, which it cannot do. As this "no usage, no access charge" term was not in the parties' written contracts, and in fact contradictory to the unambiguous text of the Subscriber Agreements, any such reliance could not be justified. Further, assuming *arguendo* that admissible evidence supported the alleged "no usage, no access charge" term, the record evidence belies Messengers' argument that they relied on that term. In order to avoid the Monthly Access charges, it was Messengers' responsibility to call and request that a wireless telephone be deactivated. The following deposition testimony shows that Messengers knew of this obligation:

> Q. What does the messenger companies do when a phone is lost?
> A. I know what they're supposed to do. They're supposed to call the company and stop the service because they can't use it for phones.
> Q. When you say, "they're supposed to call the company and stop the service," you mean they're supposed to call Nextel to stop the service, correct?
> A. I believe so, but you have to check that out with the communications department. I don't know what their procedure is.

See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. A, Buzil Dep. pg. 94. When the supervisor of Messengers' Communications Department was asked about this obligation, the following deposition testimony was elicited:

> Q. Whose responsibility was it to deactivate phones that weren't being used?

A. . . . . [I]t would be the responsibility of Juanita [Krmaschek] or Jessie [Portillo]
to call in and tell Nextel that we lost a radio; it has to be deactivated.

See id., Exh. D, Pitaro Dep. pg. 63. This evidence shows that Messengers were aware of their

obligation to contact Nextel and request deactivation to avoid being billed the Monthly Access

charge.

In short, Messengers cannot satisfy the elements required for a claim based on promissory

fraud. As Messengers bear the burden of proving each element of its fraud claim at trial, which it

has shown it cannot do, summary judgment is appropriate. See Celotex, 477 U.S. at 322.

### 2.    *Illinois Consumer Fraud and Deceptive Business Practices Act*

The elements for a violation of the Illinois Consumer Fraud and Deceptive Business Practices

Act ("Consumer Fraud Act") are: "(1) a deceptive act or practice by the defendant, (2) the

defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the

course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5)

proximately caused by the deception." Oliveira v. Amoco Oil Co., 776 N.E.2d 151, 160 (Ill. 2002).

In contrast to a claim of common law fraud, a "[p]laintiff's reliance is not an element of statutory

consumer fraud." Connick v. Suzuki Motor Co., Ltd., 675 N.E.2d 584, 593 (1996) (citation

omitted).

"The Consumer Fraud Act defines 'unfair or deceptive acts or practices' to include the use

or employment of any 'deception, fraud, false pretense, false promise, misrepresentation or the

concealment, suppression or omission of any material fact, with intent that others rely upon the

concealment, suppression or omission of such material fact.'" Weatherman v. Gary-Wheaton Bank

of Fox Valley, N.A., 713 N.E.2d 543, 552 (Ill. 1999) (citing 815 Ill. Comp. Stat. 505/2).

16

As with the promissory fraud claim, Messengers allege that Nextel charged the Monthly Access charges for wireless telephones that were not used, contrary to the alleged oral "no usage, no access charge" term, and buried these charges in voluminous invoices as part of a scheme to defraud. Messengers argue that this qualifies as "deceptive conduct" under the Consumer Fraud Act. See 815 Ill. Comp. Stat. 505/2 (2003). Messengers argue that they present more than a simple breach of contract case, arguing that Nextel made the false representations intending for Messengers to rely on those statements and continue to purchase Nextel equipment and services. However, this argument suffers from the same shortcomings that plagued the promissory fraud claim. Messengers offer no admissible evidence of any statements made by Nextel, and simply provide conclusory allegations, the type which summary judgment seeks to avoid. See Thomas, 328 F.3d at 742. The allegedly "deceptive conduct" is nothing more than an allegedly false promise not to charge monthly access fees for wireless telephones that were not being used by Messengers.

Further, the court cannot accept the argument that Nextel's invoices were deceptive. Nextel simply billed Messengers in accordance with the terms of the Subscriber Agreements. Again, Messengers were responsible for requesting that any unused wireless telephones be deactivated, which they failed to routinely do. Messengers cannot turn their own shortcomings into a cause of action against Nextel. Nextel's actions, reflected in the detailed invoices sent to Messengers, were consistent with the parties' written agreements.

Illinois case law interpreting claims for violations of the Consumer Fraud Act (as well as claims for promissory fraud) make clear that the general bar against such claims is to prevent every breach of contract claim from giving rise to a duplicative tort claim. See Zankle v. Queen Anne Landscaping, 724 N.E.2d 988, 992-93 (Ill. App. Ct. 2000) (stating that "it is settled that the

17

Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy"). Thus, Illinois law is true to the distinction between contract claims and tort claims. To the extent that Messengers' allegations are, at their core, a claim for beach of contract, then relief is not warranted when simply repackaged as fraud-based claims.

## C. Nextel West's Counterclaim

In its counterclaim, Nextel West seeks to have Messengers pay all charges invoiced, as well as late fees, attorney fees and costs, as provided in the parties' written agreements. The Subscriber Agreements provided:

> 7. NONPAYMENT / BREACH - A late payment charge of 1.5% (or the maximum interest rate permitted by law) per month, may be applied to Customer's account if monthly invoices are not paid by the due date. The late payment charge is applied to the total unpaid balance due and outstanding . . . . If Company obtains the services of a collection or repossession agency or an attorney to assist Company in remedying Customer's breach of this Agreement, including but not limited to the nonpayment for charges hereunder, Customer shall be liable for this expense . . . .

See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Group Exh. H; Ex. I.

Based on this court's analysis, it is clear that Messengers have breached the unambiguous terms of the parties' Subscriber Agreements by failing to pay Nextel for wireless telephone service, and are liable to Nextel as to the counterclaim. However, the court cannot determine the amount that Messengers are liable for with any degree of certainty.

In their Amended Counterclaim, Nextel West states the amount of charges owed by Messengers as $139, 319.64. See Defs.' Am. Counterclaim, ¶26. However, in their motion for summary judgment, Nextel West states the amount of charges owed as $128, 729.54. See Defs.' Mot. for Summ. J., pg. 16. Nextel West explains this disparity by indicating that certain valid credits

18

were not applied to Messengers' accounts, and with these credits the amount owed is then $128,729.54.

Messengers offer numerous arguments in opposition to Nextel's motion for summary judgment as to the counterclaim. First, Messengers contend that no outstanding balance exists, as Nextel breached the "no usage, no access charge" term of the parties' agreements; however, this claim has been rejected. Second, Messengers dispute that their outstanding balance is $139,319.64, as they contend that this amount does not take into account substantial credits that Nextel admittedly owes to Messengers. In support of the argument that Nextel owes substantial credits, Messengers point to the depositions of two Nextel employees who concede that errors did occur with regard to the billing of Messengers' account. See Defs.' Local Rule 56.1 Statements of Uncontested Facts, Exh. K, Burns Dep., pg. 75 (indicating that some errors had been made with regard to Messengers' invoices); Exh. J, Black Dep., pg. 129 (same). Beyond these admissions that errors were made with regard to the billing of Messengers' account, there is no further evidence detailing what credits were given and what credits, if any, remain. Based on the dearth of information in the record concerning the credits which Messengers have received, or may still be entitled to, the court cannot determine the amounts due to Nextel for wireless service with any degree of certainty.

Furthermore, the exact amount of Messengers' liability for late fees is also uncertain based on representations made by Nextel employees indicating that Messengers did not have to pay the charges until the billing dispute was resolved. After Messengers stopped paying Nextel's invoices, the parties engaged in extensive discussions and negotiations to resolve this dispute. During the course of those negotiations, Messengers state that employees of Nextel, Beltrano and Burns, repeatedly instructed Messengers not to make any further payments until the dispute had been

resolved. Since the dispute is not resolved, as evidenced by this lawsuit, and construing the facts in the light most favorable to Messengers, it is not clear that late fees should be calculated from November 28, 2001, the date of the service termination, as argued by Nextel.

In short, while Messengers are liable to Nextel West for breaching the Subscriber Agreements by failing to make payments, the exact amount of damages cannot be determined on the current record.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment as to Plaintiffs' Amended Complaint is granted, and Nextel West's Motion for Summary Judgment as to its Amended Counterclaim is granted in part and denied in part.

IT IS SO ORDERED.

ENTER:

_Charles R Norgle_

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: _9-23-03_

20